UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERYL PATTEN,

    Plaintiff,                                Case No. 10-10822
                                                Hon. Lawrence P. Zatkoff

v.

GUARDIAN LIFE INSURANCE COMPANY
OF AMERICA,

    Defendant.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on September 27, 2011

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court upon cross-motions for summary judgment filed by the parties, and the parties have fully briefed the issues. The Court finds that the facts and legal arguments pertinent to the parties' motions are adequately presented in the parties' papers, and the decision process will not be aided by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(f)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted, without this Court entertaining oral arguments. For the reasons that follow, Plaintiff's Cross Motion for Judgment (Docket #19) is DENIED, and Defendant's Motion for Entry of Judgment (Docket #26)[1] is GRANTED.

---

[1] Defendant also filed two other documents titled Motion for Entry of Judgment (Docket #s 18, 25). As those two documents address the same issues and contain the same arguments as the Motion for Entry of Judgment filed as Docket #26, the Court DENIES AS MOOT Docket #s 18 and 25.

## II. BACKGROUND

**A.     Disability under the Plan**

As an employee of Lake Orion Nursing Center, Plaintiff was eligible to participate in its employee welfare benefit plan (the "Plan"), which included group long term disability benefits insured by Defendant. The Plan defines disability as:

> during the elimination period [defined as 90 days, for a disability resulting from sickness] and the own occupation period [defined as the first 24 months of benefit payments] you are not able to perform, on a full-time basis, the major duties of your own occupation. After the end of the own occupation period, you are: (a) not able to perform two or more activities of daily living, on a routine basis, without help; or (b) cognitively impaired and need verbal cueing to protect yourself or others.

After the expiration of the own occupation period (hereinafter, "Own Occupation Period"), a participant must provide proof of disability "by an independent entity that specialize[s] in the assessment of a person's: (i) ability to perform activities of daily living ("ADLs"); or (ii) cognitive impairment." Proof of such a disability requires that the participant: (1) provide satisfactory proof of medical evidence in support of the limits causing the continued disability, (2) provide satisfactory proof that the participant is under continued regular care by a doctor appropriate for the cause of the disability, and (3) allow periodic assessments by an independent entity to assess the participant's ability to perform activities of daily living or cognitive impairment.

As defined in the Plan, "activities of daily living" ("ADLs") include: bathing, dressing, toileting, transferring, continence and eating. The Plan defines "Cognitive Impairment" as:

> A decline or loss in intellectual aptitude. Such loss may result from: (a) injury; (b) sickness; (c) Alzheimer's disease, or (d) like forms of senility or irreversible dementia. It must be supported by clinical proof and standardized tests that precisely measure decline in the areas of: (i) short term memory; (ii) orientation to time, place and person; (iii) deductive or abstract reasoning; and (iv) judgment as it relates to awareness or safety.

**B.     Plaintiff's Claim - Initially Approved, Subsequently Denied**

Plaintiff submitted her initial claim for long term disability benefits on January 26, 2007, based on a diagnosis of Viral Hepatitis C and associated symptoms of pain in her upper right

2

abdomen, nausea and vomiting. At that time, Plaintiff was a Licensed Practical Nurse working for Lake Orion Nursing Center as a Medication/Charge Nurse in the Long Term Care area. According to her employer, Plaintiff's last date of work was November 7, 2006. Plaintiff's claim for disability benefits was initially approved, effective February 11, 2007, following the applicable 90 day elimination period. By letter dated June 15, 2007, Plaintiff was informed that her claim for disability benefits had been approved and that, due to the Plan's terms providing for the integration of other income (defined in the Plan as "Other Sources of Income"), her receipt of other benefits such as Social Security could reduce her long term disability benefit. Plaintiff was directed to contact Defendant if any such Other Sources of Income were approved. With respect to lump sum payments for back benefits, Defendant specifically informed Plaintiff:

> *If you receive any retroactive lump sum award, your claim will be recalculated to reflect the deduction as of your original entitlement date. You will be responsible for any overpayment that may occur on your claim due to the above noted information.*

(emphasis in original).

In connection with the commencement of the payment of her long term disability benefits, Plaintiff signed a Reimbursement Agreement on July 14, 2007. Therein, Plaintiff acknowledged and agreed that, in consideration for receiving the full amount of the long term disability benefit (*i.e.*, not having the disability benefits payable under the Plan reduced by any anticipated Other Sources of Income), she would reimburse Defendant for any resulting overpayment if she was later found to be eligible for any Other Source of Income:

> In exchange for [Defendant]'s agreement to waive its assumption of any Other Sources of Income for which I may be eligible, I hereby agree to reimburse [Defendant] for any resulting overpayment in the event that I am found to be eligible. I further agree to notify [Defendant] of any and all decisions, concerning any Other Sources of Income, immediately upon being informed of same.

Plaintiff continued to receive benefits throughout the entire Own Occupation Period, based in part on the assessment of Defendant's Registered Nurse (D. Jackson) that Plaintiff's medical information supported ongoing limitations related to migraines, cellulitis, neuropathy, depression and anxiety. Several months prior to the end of the Own Occupation Period (which was February 11, 2009), Defendant began to request information from Plaintiff for the purpose of evaluating Plaintiff's ability to perform the ADLs. In response to Defendant's inquiry, Plaintiff's treating provider Jules Reinhardt, D.O. ("Dr. Reinhardt"), submitted an ADL assessment form dated December 2, 2008 (the "December 2, 2008 ADL Assessment"). Therein, Dr. Reinhardt indicated that Plaintiff: (a) was independently capable of bathing, dressing, toileting, transferring and eating, and (b) was fully continent. Dr. Reinhardt also stated that Plaintiff had no form of cognitive impairment with respect to: (1) short term memory, (2) orientation of time, place or person, (3) deductive or abstract reasoning, or (d) judgment related to awareness of safety.

Based on Dr. Reinhardt's assessment that she was capable of performing all ADL's and had no cognitive impairment, Defendant determined that Plaintiff would not meet the Plan's definition of disability after the end of the Own Occupation Period. Therefore, by letter to Plaintiff dated January 8, 2009, Defendant explained that: (1) the definition of disability changed after the 24-month Own Occupation Period, and (2) based on Dr. Reinhardt's assessment, Plaintiff was not entitled to receive long term disability benefits after February 11, 2009.

Plaintiff requested a review of Defendant's decision, claiming that there were days that she did not get out of bed, eat or shower, and that she needed help with meals, medication, housework and transportation. Plaintiff also claimed that she often fell when walking and that she was unable to hold her grandchildren without fear of dropping them. In connection with her appeal, Plaintiff provided a January 19, 2009 letter from Dr. Reinhardt to the attorney handling Plaintiff's Social

Security Disability claim. In that letter, Dr. Reinhardt indicated that Plaintiff's symptoms "wax and wane" and that "on some days, she cannot perform even basic activities of daily living" (although Dr. Reinhardt does not mention what activities Plaintiff was unable to perform). Dr. Reinhardt also advised that fatigue and medication side effects result in Plaintiff experiencing: "forgetfulness, an inability to maintain concentration, memory loss and an inability to stay on task or, at times, complete even simple tasks in a timely manner."

In support of her appeal, Plaintiff also provided Defendant with updated treatment records, including: (1) a February 16, 2009 MRI of her brain, which was provided to Defendant on February 26, 2009; and (2) a report on a Defendant form completed by Dr. Leticia Kimpo, a physician on staff at List Psychological Services. The MRI indicated "minimal scattered chronic white matter ischemic disease as well as some increased T2 signal . . . which can be seen in patient's [sic] status post chemotherapy." Dr. Kimpo, who specializes in psychiatry, began seeing Plaintiff in February 2008 and dated her report February 17, 2009. Dr. Kimpo's diagnoses as to Plaintiff's impairment(s) that "would interfere with [Plaintiff's] ability to work on a <u>continuous, sustained basis, 8 hrs. per day, 5 days per week</u>" were: "major depression, . . . [and] anxiety disorder . . ." Dr. Kimpo also indicated that Plaintiff was "moderately limited" in the following work-related abilities:

    (a)    to understand, remember and carry out simple instructions,
    (b)    to understand, remember and carry out detailed instructions,
    (c)    to interact with the general public, and
    (d)    to respond appropriately to criticism from supervisors.

Dr. Kimpo further indicated that Plaintiff was "markedly limited" in the following work-related abilities:

    (1)    to make simple work-related decision,
    (2)    to make complex work-related decisions,
    (3)    to maintain attention and concentration for extended periods,
    (4)    to perform at a consistent pace,

5

  (5)  to work in coordination with or get along with coworkers,
  (6)  to cope with a stressful work environment, and
  (7)  to cope with changes in a routine work setting.

After reviewing those materials, on March 20, 2009, Defendant sent a letter to Dr. Reinhardt asking him to review his responses to the December 2, 2008 ADL Assessment and advise whether his conclusions therein were still accurate. On March 24, 2009, Dr. Reinhardt faxed a letter to Defendant, wherein he confirmed the information he provided in the December 2, 2008, ADL Assessment was still accurate - *i.e.*, it was his opinion that Plaintiff was able to independently perform all ADL's and that she had no cognitive impairment.

By letter dated May 11, 2009, Defendant informed Plaintiff that it had conducted a thorough review of all of the medical records and other information provided in support of Plaintiff's claim. Therein, Defendant advised Plaintiff that it was upholding its decision to terminate payment of benefits. Defendant again set forth the definitions of disability under the Plan and the 24-month Own Occupation Period. Defendant also noted the requirement under the Plan that, after the Own Occupation Period, Plaintiff had to demonstrate an inability to perform two or more ADL's on a routine basis, without help, or to be cognitively impaired, as evidenced by clinical testing that showed a decline in: (1) short term memory, (2) orientation to time, place and person, (3) deductive reasoning, or (4) judgment relating to safety awareness. Defendant advised that Plaintiff's letter describing her own symptoms and complaints did not satisfy those terms of the Plan. Defendant acknowledged that medical information was provided (including Dr. Reinhardt's letter describing her symptoms, her MRI report and Dr. Kimpo's report) which established that Plaintiff may be suffering from conditions that require ongoing medical treatment and limitation of her activities. Defendant stated that, because Dr. Reinhardt had confirmed (in his March 24, 2009 communication) that his December 2, 2008 ADL Assessment continued to be accurate, Plaintiff did not satisfy the

6

Plan's definition of disability beyond the Own Occupation Period and that no further disability benefits were payable.

### C. Social Security Disability Benefits Paid to Plaintiff

Several weeks after Plaintiff's appeal was denied, in compliance with the Plan, Plaintiff provided Defendant with a copy of the May 23, 2009 Notice of Award of benefits Plaintiff received from the Social Security Administration ("SSA"). The Notice of Award of benefits revealed that the SSA had concluded that Plaintiff was disabled as of November 2006. The SSA indicated that Plaintiff would receive an award of back benefits in the amount of $15,471.65 for the period May 2007 through April 2009, based on benefits of $841.50 per month. In a letter dated August 17, 2009, Defendant advised Plaintiff that it was Defendant's position that she had to repay Defendant an amount equal to the to the Social Security benefits paid to Plaintiff for the period during which she also received disability benefits under the Plan. To date, Plaintiff has not made any repayment to Defendant.

Through its Complaint, Plaintiff seeks to have the Court order Defendant to pay her disability benefits under the Plan for the period after February 11, 2009. In its counter-claim, Defendant asks the Court to enter judgment against Plaintiff for overpayments Defendant contends it is entitled to as the result of Plaintiff being awarded Social Security benefits as of May 2007.

### III. LEGAL STANDARD

**A.    Judgment to be Decided Based Solely upon the Administrative Record**

This matter is before the Court on the parties' cross-motions for entry of judgment on the administrative record, "the alternative to summary judgment in ERISA [Employee Retirement Income Reimbursement Act of 1974, 29 U.S.C. §1101 *et seq.*] denial of benefit cases." *Hamilton v. Pharmacia & Upjohn Co.*, 51 F. Supp. 2d 834, 835 (W.D. Mich. 1999) (citing *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir. 1998)). In *Wilkins*, the court set forth "Suggested Guidelines" for the procedural adjudication of cases challenging the denial of ERISA benefits. *Id.* at 619. These guidelines provide that neither summary judgment pursuant to Rule 56 nor a standard bench trial pursuant to Rule 52 is appropriate for the disposition of ERISA denial of benefits cases. *Id.* at 618-19. Instead, the reviewing court must determine and apply the proper standard of review based upon the material in the administrative record. *Id.*

**B.    Standard of Review**

The parties agree that the Court is to review Defendant's benefit determination *de novo*, and on August 1, 2011, the Court entered an order confirming that it would use the *de novo* standard of review in this case. According to the Sixth Circuit,

> When applying a *de novo* standard in the ERISA context, the role of the court reviewing a denial of benefits "is to determine whether the administrator . . . made a correct decision. The administrator's decision is accorded no deference or presumption of correctness. The review is limited to the record before the administrator and the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan.

*Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801, 808-9 (6th Cir. 2002)(citing *Perry v. Simplicity Eng'g*, 900 F.2d 963, 965 (6th Cir. 1990)). *See also, Miller v. Hartford Life Ins. Co.*, 348 F.Supp.2d 815, 817 (E.D. Mich. 2004) ("When undertaking a *de novo* review, the Court 'simply

decides whether or not it agrees with the decision under review.'") (quoting *Anderson v. Great W. Life Assurance*, 777 F.Supp. 1374, 1376 (E.D. Mich. 1991) and *Perry, supra*)).

C.     **Any Alleged Financial Conflict Of Interest is *De Minimis***

Where the court will review the record *de novo* (*i.e.*, by independently reviewing the administrative record rather than reviewing it for abuse of discretion and affording deference to the decisions of the plan administrator), "the significance of the administrator's conflict of interest evaporates." *McCollum v. Life Ins, Co of No. America,* WL 5015394 at *2 (E.D. Mich. 2010) (quoting *Price v. Hartford Life and Acc. Ins. Co.,* 746 F.Supp.2d 860, 866 (E. D. Mich. 2010)). Therefore, any alleged conflict of interest in this matter is irrelevant and has not been considered as part of this Court's *de novo* review of the administrative record.

## IV.  ANALYSIS

A.     **Plaintiff Failed to Satisfy the Definition of Disability After the Own Occupation Period**

It is undisputed that Plaintiff was disabled during the elimination period and the Own Occupation Period and that Defendant paid Plaintiff all disability benefits during those periods. In order to qualify as disabled under the Plan following the Own Occupation Period, however, Plaintiff was required to demonstrate that: (a) she was routinely unable to independently perform two or more ADLs, or (b) she was cognitively impaired and needed verbal cueing to protect herself and others. Defendant does not dispute that Plaintiff has been diagnosed with a number of medical conditions, but it argues that having medical conditions, in itself, does not satisfy the Plan's definition of disability after the Own Occupation Period ends. Defendant further argues that the medical records and information provided in support of Plaintiff's claim failed to satisfy the more restrictive, post-Own Occupation Period definition of disability. Plaintiff disagrees and argues that she still suffers

9

from a host of medical conditions and symptoms such that she continued to be disabled, even under the more restrictive, post-Own Occupation Period definition of disability.

Defendant contends that its decision to deny Plaintiff benefits beyond the Own Occupation Period was based on the fact that Plaintiff's own treating physician (Dr. Reinhardt) confirmed that Plaintiff can perform her ADLs and had no cognitive impairment. Defendant relies on Dr. Reinhardt's December 2, 2008 ADL Assessment, wherein he indicated that Plaintiff was able to independently bathe, dress, toilet, transfer and eat, that she was fully continent, and that she has no form of cognitive impairment with respect to: (1) short term memory, (2) orientation of time, place or person, (3) deductive or abstract reasoning, or (4) judgment related to awareness of safety.

Plaintiff counters that Dr. Reinhardt's December 2, 2008 ADL Assessment was trumped by Dr. Reinhardt's January 19, 2009 letter, wherein Dr. Reinhardt stated that: (a) Plaintiff's symptoms "wax and wane" and that "on some days, she cannot perform even basic activities of daily living" (although he did not specify what activities she was unable to perform), and (b) Plaintiff had experienced "[l]ack of good sleep, extreme fatigue and side effects of medication result in forgetfulness, an inability to maintain concentration, memory loss and an inability to stay on task or, at times, complete even simple tasks in a timely manner."

Plaintiff asserts that Defendant never attempted to follow up with Dr. Reinhardt after he wrote the January 19, 2009 letter and, as such, Defendant erred in concluding that Plaintiff was not disabled after the 24-month Own Occupation Period. The administrative record in this case, however, reveals that Plaintiff's assertion is incorrect. First, after reviewing Dr. Reinhardt's January 19, 2009 letter, Defendant sent Dr. Reinhardt a letter on March 20, 2009. Therein, Defendant asked Dr. Reinhardt to review his responses to the December 2, 2008 ADL Assessment and advise Defendant whether his responses in that ADL Assessment were still accurate. Second, Dr. Reinhardt

10

replied to Defendant's March 20, 2009 letter, advising that: "Yes, the information I provided [in the December 2, 2008 ADL Assessment] continues to be accurate." In other words, according to Dr. Reinhardt, as of March 24, 2009, Plaintiff: (1) was still able to independently perform all ADLs, and (2) had no cognitive impairment. Plaintiff has presented no other medical evidence that she was disabled beyond February 11, 2009 (the end of the Own Occupation Period) as the result of being routinely unable to independently perform two or more ADLs. For the foregoing reasons, the Court agrees with Defendant's conclusion that Plaintiff did not establish disability after the Own Occupation Period on the basis of routinely being unable to independently perform two or more ADLs.

Plaintiff next argues that she was cognitively impaired, as evidenced by medical records from Dr. Reinhardt and Dr. Kimpo, both of whom discuss Plaintiff's cognitive impairments in some manner. As to Dr. Reinhardt, the Court finds that Plaintiff has presented no evidence of cognitive impairment other than that set forth in the January 19, 2009 letter (*i.e.*, "Lack of good sleep, extreme fatigue and side effects of medication result in [Plaintiff experiencing] forgetfulness, an inability to maintain concentration, memory loss and an inability to stay on task or, at times, complete even simple tasks in a timely manner."). To the extent that such observations or comments demonstrated any cognitive impairment, however, the Court finds that such observations or comments are wholly eviscerated by Dr. Reinhardt's December 2, 2008 ADL Assessment, especially as he reaffirmed the December 2, 2008 diagnosis in his March 24, 2009 response to Defendant's March 20, 2009 letter. As Dr. Reinhardt clearly answered on both December 2, 2008 and March 24, 2009, his assessment of Plaintiff's cognitive abilities reflected no decline or loss of her: (a) short term memory; (b) orientation to time, place and person; (c) deductive or abstract reasoning; or (d) judgment related to awareness of safety.

11

Plaintiff also contends, and Defendant does not dispute, that: (a) Defendant never attempted to contact Dr. Kimpo, or (b) the May 11, 2009 denial letter sent to Plaintiff by Defendant did not discuss Dr. Kimpo's report or diagnoses in detail. Based on a letter to Plaintiff dated March 20, 2009 (stating "We acknowledge receipt of the additional medical records from . . . Dr. Leticia Kimpo, and List Psychological Services"), as well as language in the May 11, 2009 denial letter ("In addition, we reviewed medical records from List Psychological Services [for whom Dr. Kimpo worked] for the period 2008 through 2009"), however, the Court concludes that Defendant received and reviewed the medical records from Dr. Kimpo prior to issuing its final denial letter on May 11, 2009. The Court also finds that, even to the extent that they noted some cognitive impairment in Plaintiff, neither Dr. Reinhardt's reports nor Dr. Kimpo's report indicated that such observations of cognitive impairment were, as required by the Plan:

> supported by clinical proof and standardized tests that precisely measure decline in the areas of: (i) short term memory; (ii) orientation to time, place and person; (iii) deductive or abstract reasoning; and (iv) judgment as it relates to awareness or safety.

The Court further notes that none of the reports address the Plan requirement that Plaintiff demonstrate that the cognitive impairment is such that Plaintiff "need[ed] verbal cueing to protect [her]self or others" (emphasis added).

Plaintiff next argues that Defendant's denial letters were inadequate because they do not discuss the "plethora of medical evidence [submitted by Plaintiff] that shows that the Plaintiff [was] cognitively impaired." The Court finds that Plaintiff's argument ignores the plain language of Defendant's May 11, 2009 denial letter. Therein, Defendant informed Plaintiff that it considered: (a) Dr. Reinhardt's December 2, 2008 ADL Assessment, and (b) a letter Plaintiff faxed to Defendant on February 5, 2009. As stated above, the February 5, 2009 letter stated, among other things, that: (1) Plaintiff could not get out of bed, eat, shower or speak to anyone on some days, (2) she has

12

trouble staying upright while walking, (3) she could not hold her grandchildren for fear of dropping them, (4) she did not drive, and (5) her daughters and neighbor help her with her meals, medication, housework and transportation. The May 11, 2009 denial letter also stated:

> We reviewed additional medical information submitted by Dr. Reinhardt, including his January 9, 2009 letter addressed to Stapleton Law Offices, medical records for the period November 13, 2006 through February 23, 2009, and the February 16, 2009 MRI report. In addition, we reviewed medical records from List Psychological Services [Dr. Kimpo] for the period 2008 through 2009.
>
> We do not dispute that you may be suffering from a condition that requires ongoing medical treatment and limits your activities. However, the additional medical information submitted to support your appeal does not provide any medical evidence or documentation supporting your loss of two or more activities of daily living, on a routine basis, without help, or of cognitive impairment as defined in the plan.

Plaintiff also contends that, because Defendant conducted only a file review and did not have a doctor examine Plaintiff, Defendant's method of assessing her claim should weigh against a finding that Defendant did not act in an arbitrary and capricious manner. *Relying on Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) (file review was inadequate where the report did not describe the data reviewed and made no mention of medical records). The Court finds, however, that Defendant was not obligated to have a doctor examine Plaintiff in this matter. First, although the Plan allows Defendant to have an independent doctor examine Plaintiff, the Plan does not bar Defendant from conducting a file review of the doctors' reports submitted to Defendant by Plaintiff. Second, as discussed above, Defendant's conclusion that Plaintiff was not disabled under the Plan was based on, and is supported by, the diagnoses of her physician, Dr. Reinhardt, as set forth in the December 2, 2008 ADL Assessment and reaffirmed by Dr. Reinhardt on March 24, 2009. Third, unlike in *Calvert*, Defendant's May 11, 2009 denial letter did describe the data and medical records reviewed.

13

Plaintiff next asserts that, although Defendant encouraged Plaintiff to apply for Social Security benefits, Defendant failed to address/acknowledge in its review that the SSA determined that Plaintiff was disabled, at least in part because of Plaintiff's cognitive problems. This argument fails for two reasons. First, the SSA decision finding Plaintiff to be disabled was dated May 5, 2009, six days before Defendant issued its second and final denial letter. Defendant states (and Plaintiff does not dispute) that Defendant did not receive notice of the SSA decision until May 26, 2009, when Defendant received a facsimile copy of the May 23, 2009 Notice of Award from Plaintiff's SSA attorney. As such, both of Defendant's letters denying Plaintiff post-Own Occupation Period benefits under the Plan were completed and issued prior to the time Defendant became aware of the SSA determination that Plaintiff was disabled. Accordingly, Defendant could not have taken the SSA's finding of disability into account (or addressed why Defendant's conclusion on disability differed from the SSA's determination) when Defendant made its decision(s) to deny Plaintiff continued benefits under the Plan. Second, the law is clearly established in the Sixth Circuit that the decision of an SSA administrative law judge is not binding on Defendant's determination regarding disability. *See, e.g.*, *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005).

For the reasons set forth above, and based on a review of the evidence submitted in support of Plaintiff's claim that is in the administrative record, the Court finds that: (1) Defendant correctly determined that Plaintiff did not have a disability under the Plan for the post-Own Occupation Period, and (2) Defendant properly terminated payments of benefits to Plaintiff, effective February 11, 2009, for failure to satisfy the definition of disability under the Plan.

**B.     Defendant's Counter-claim**

In the Sixth Circuit, an ERISA plan/fiduciary is entitled to reimbursement of overpaid disability benefits where Social Security benefits were also paid for that period – if the plan reimbursement provision identifies a particular fund and the share of that fund (as opposed to the claimant's general assets) to which the plan/fiduciary is entitled. *See Sereboff v. Mid Atlantic Medical Serv., Inc.*, 547 U.S. 356, 364 (2006); *Hall v. Liberty Life Assur. Co.*, 595 F.3d 270, 275 (6th Cir. 2010). In this case, the Plan expressly provides that receipt of other income replacement benefits (Social Security disability benefits are specifically identified as such) are to be "integrated" with long term disability benefits payable under the Plan. Moreover, the Plan specifically provides that Plaintiff is obligated to repay any overpayment of benefits, either through a reduction in ongoing benefits, or by payment in full. In fact, as a condition of receiving the full amount of disability benefits (*i.e.*, without any reduction for anticipated Other Sources of Income), Plaintiff signed the Reimbursement Agreement. In doing so, Plaintiff expressly agreed, in writing, to "immediately reimburse Defendant for any overpayment resulting from benefits which were paid without reduction from Social Security Disability" benefits.

It is undisputed that Plaintiff received a lump sum payment of retroactive Social Security benefits that covered a period that overlapped with part of the period Defendant paid long term disability benefits to Plaintiff. The overlapping period was from May 2007 to February 2009. It is also undisputed that Defendant paid Plaintiff $35,482.34 for that time period. Defendant contends that, because Plaintiff was paid benefits under the Plan and received Social Security disability benefits for that same period, Defendant should have only paid Plaintiff $17,728.81. As a result, Defendant asserts that its payments to Plaintiff resulted in an overpayment of $12,546.18 (after Defendant allowed Plaintiff a credit for the attorney fees amount of the SSA award). Plaintiff does not dispute any of the figures set forth by Defendant, but Plaintiff has not reimbursed Defendant in

15

any amount because Plaintiff believes that Defendant is seeking compensatory damages, which is not permissible under ERISA. *See Great West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213-14 (2002).

The Court finds that Defendant is seeking equitable relief in this case and, as such, it is governed by *Hall* and *Sereboff*. As in *Hall*, the Plan documents expressly allow for recovery of overpaid benefits and, more significantly, Defendant has limited the equitable remedy it seeks to "a specifically identifiable fund (the overpayments themselves) within [Plaintiff's] general assets, with the Plan entitled to a particular share (all overpayments due to her receipt of Social Security benefits, not to exceed the amount of benefits paid)." *Hall*, 595 F.3d at 275. *See also* 29 U.S.C. § 1132(a)(3). Accordingly, the Court holds that Defendant is entitled to recover from Plaintiff the amount of the overpayments received by Plaintiff from the SSA during the period from May 2007 to February 11, 2009. As Defendant has represented, and Plaintiff has not contested, that the correct amount of overpayment is $12,546.18, the Court concludes that Defendant is entitled to judgment in the amount of $12,546.18 on its counter-claim.

**C.     Conclusion**

Accordingly, and for the reasons set forth above, the Court denies Plaintiff's cross motion for judgment and grants Defendant's motion for entry of judgment.

## V.  CONCLUSION

Accordingly, and for the reasons set forth above, the Court hereby ORDERS that Plaintiff's Cross-Motion for Judgment (Docket #19) is DENIED, and Defendant's Motion for Entry of Judgment (Docket #26) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's cause of action is hereby DISMISSED WITH PREJUDICE.  IT IS FURTHER ORDERED that, with respect to Defendant's Counter-claim, judgment is entered in favor of Defendant, and Plaintiff shall reimburse Defendant the amount of $12,546.18, plus applicable interest, if any, for overpayments made by Defendant.

Judgment shall be entered accordingly.

IT IS SO ORDERED.

> s/Lawrence P. Zatkoff
> LAWRENCE P. ZATKOFF
> UNITED STATES DISTRICT JUDGE

Dated:  September 27, 2011

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on September 27, 2011.

> s/Marie E. Verlinde
> Case Manager
> (810) 984-3290